Rose Marie FLOYD and Terry Floyd, her husband, Connie Gale and Michael Gale, her husband, Michael Gale and Connie Gale, his wife, Gloria Patterson, Edmond Patterson, Thomas J. Nolan, Robert Scharhag, Eugene H. Champ, Frederick W. Hoehler, IV, Sally Ann Collins, Michael R. Dramis, Sandy Dix and Gary Dix, her husband, Dana Dix, By and Through her parents Gary Dix and Sandy Dix, as guardians and next friends, Alexander Dix, By and Through his parents Gary Dix and Sandy Dix, as guardians and next friends, Gerri Ash Self, Susan Rooney and William Rooney, her husband, Janet Jacobs and Bruce Jacobs, her husband, Alexander Embry, Salim Khoury and Deborah Khoury, his wife, Bruce Jacobs and Janet Jacobs, his wife, Myriam Carrasco (f/k/a Myriam Riley) Terry Floyd and Rose Marie Floyd, Gary Dix and Sandy Dix, his wife, Salim Khoury and Deborah Khoury, his wife, Gregory Mantz, By and Through his parents, Netta Mantz and Harold D. Mantz, as guardians and next friends Netta Mantz, Harold Mantz, Gregory D. Mantz, By and Through his father Harold D. Mantz, Plaintiffs–Appellants,

v.

**EASTERN AIRLINES, INC.,** Defendant–Appellee.

No. 86–5381.

United States Court of Appeals, Eleventh Circuit.

May 5, 1989.

Joel D. Eaton, Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin, P.A., Miami, Fla., for plaintiffs-appellants.

Kathleen M. O'Connor, Thornton, David & Murray, P.A., Miami, Fla., for defendant-appellee.

Before JOHNSON and ANDERSON, Circuit Judges, and ATKINS *, Senior District Judge.

ANDERSON, Circuit Judge:

This case presents difficult questions of interpretation of the Warsaw Convention. It also presents a difficult question concerning a Florida state law cause of action for intentional infliction of emotional injury; however, this court is bound by the state court's resolution of this issue. The case also presents issues relating to preemption of the state law cause of action. Because we hold that the district court erred in its construction of the Warsaw Convention, we reverse its judgment and remand with instructions. In addition, we reverse the district court's refusal to grant leave to two plaintiffs to amend their complaints.

---

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

## I. FACTS

Eastern Airlines flight 855 left Miami en route to Nassau, Bahamas on the morning of May 5, 1983. During the flight, one of the airplane's three engines lost oil pressure. The crew shut down the ailing engine and headed back to Miami. Shortly thereafter, the second and third engines failed. Without power, the plane began losing altitude, and the crew told the passengers that they would have to ditch the plane in the Atlantic Ocean. Fortunately, the crew managed to restart the engine that had initially failed and to land the plane safely at Miami International Airport.

The plaintiffs in the twenty-five consolidated cases before us today were passengers on flight 855. Except for two cases discussed below, they have brought suit claiming damages solely for mental distress arising out of this incident. These claims are grounded on two theories.[1] The first is a cause of action for intentional infliction of emotional distress under Florida law.[2] The second arises under the Warsaw Convention.[3] The United States District Court for the Southern District of Florida granted judgment on the pleadings in favor of Eastern, holding that the plaintiffs failed to state a claim upon which relief could be granted under either Florida or federal law. *In re Eastern Airlines, Inc., Engine Failure, Miami International Airport on May 5, 1983,* 629 F.Supp. 307 (S.D.Fla.1986). In considering plaintiffs' appeal, then, we look only to the face of the complaint and must accept its allegations as true.[4]

We address in turn plaintiffs' state law claim for intentional infliction of emotional distress (Part II), the cause of action under the Warsaw Convention for emotional injury (Part III), preemption (Part IV), plaintiffs' claim for punitive damages pursuant to Article 25 of the Warsaw Convention (Part V.A.), preemption of plaintiffs' state law claim for punitive damages (Part V.B.), guidance on remand with respect to willful misconduct under the Warsaw Convention (Part VI), and denial of leave to amend the complaints of two plaintiffs (Part VII).

## II. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM

Plaintiffs alleged that Eastern's maintenance personnel responsible for Flight 855 had failed to install the required oil seals or "O-rings" necessary to prevent oil leaks; that Eastern's records revealed that its aircraft had experienced a dozen prior engine failures stemming from the absence of O-rings; and that Eastern knowingly failed to institute appropriate procedures to correct the problem. The plaintiffs sought damages for intentional infliction of emotional distress based upon these allegations under Florida law.

In a case arising out of the same incident as the cases before us today, the Florida Third District Court of Appeal sitting *en banc* held that plaintiffs' allegations stated a cause of action under Florida law. *King v. Eastern Airlines, Inc.,* 536 So.2d 1023 (Fla. 3d D.C.A.1987).[5] This

---

1. The plaintiffs also brought breach of contract and negligence claims under Florida law, but they did not appeal the district court's dismissal of those claims.

2. The parties agree, and the district court held, that Florida law governs plaintiffs' claim for intentional infliction of emotional distress. *In re Eastern Airlines, Inc., Engine Failure, Miami International Airport on May 5, 1983,* 629 F.Supp. 307, 309 n. 1 (S.D.Fla.1986).

3. Convention for the Unification of Certain Rules Relating to International Transportation by Air, concluded at Warsaw, Poland, October 12, 1929, adhered to by the United States June 27, 1934, 49 Stat. 3000, 3014, reprinted in 49 U.S.C. note following § 1502. We shall refer to this treaty by its more popular and less cumbersome name, the Warsaw Convention.

4. The plaintiffs have represented to this court that their complaints are identical in all respects material to this appeal. Since Eastern has not challenged this representation, we accept it as true. We work from the complaint in the Floyd case, and any references to "the complaint" are to that one, except in Part VII, *infra.*

5. The Florida court also held that plaintiffs' claims did not state a cause of action under federal law, the Warsaw Convention. 536 So.2d at 1026–27. The parties concede that this court is not bound by that aspect of the Florida court's holding.

court is bound by that interpretation of Florida law in the absence of some persuasive indication that the Florida Supreme Court would hold otherwise. *Bradbury v. Wainwright*, 718 F.2d 1538, 1540 (11th Cir. 1983); *Silverberg v. Paine, Webber, Jackson & Curtis, Inc.*, 710 F.2d 678, 690 (11th Cir.1983). We note that on March 9, 1989, the Supreme Court of Florida accepted jurisdiction in the *King* case.[6] For purposes of this opinion only, we assume that the law of Florida is as enunciated by the Third District Court of Appeals. However, on remand the district court will be bound by the decision of the Supreme Court of Florida on the issue of the state law cause of action for intentional infliction of emotional distress.

## III. WARSAW CONVENTION CLAIM

In their amended complaints, plaintiffs assert a claim for damages under the Warsaw Convention. The Convention is an international treaty to which the United States is a party. *Air France v. Saks*, 470 U.S. 392, 396, 105 S.Ct. 1338, 1341, 84 L.Ed. 2d 289 (1985). Most of the major countries of the world adhere to the Warsaw Convention, including the Bahamas, the intended destination of Flight 855. *See* Lee S. Kreindler, 1 *Aviation Accident Law* § 11.01[3] at 11–7 (1988) (listing countries which are parties to the Convention). The Convention applies to "all international transportation of persons, baggage, or goods performed by aircraft for hire." Warsaw Convention Art. 1.

The Warsaw Convention was the result of two international conferences, held in Paris in 1925 and Warsaw in 1929, and of the work done in the interim by the Comité International Technique d'Experts Juridiques Aériens ("CITEJA"). *Block v. Compagnie Nationale Air France*, 386 F.2d 323, 326–27 (5th Cir.1967) (discussing background of Warsaw Convention), *cert. denied*, 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968). At that time, commercial air travel was in its infancy, but "[c]ommon rules to regulate international

air carriage ha[d] become a necessity." *Minutes, Second International Conference on Private Aeronautical Law, October 4–12, 1929, Warsaw* 13 (English translation by Robert C. Horner and Didier Legrez 1975) ("*Minutes*") (address of Mr. Lutostanski, head of the Polish delegation).

The conference at Warsaw had two goals. First, to establish uniformity as to documentation such as tickets and waybills, and procedures for dealing with claims arising out of international transportation. *See Minutes* at 85, 87. The second, and more important at the time, goal of the conference was to limit the potential liability of air carriers in the event of accidents and lost or damaged cargo. *See Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 256, 104 S.Ct. 1776, 1784, 80 L.Ed.2d 273 (1984); *Minutes* at 37; Andreas F. Lowenfeld and Allan I. Mendelsohn, *The United States and The Warsaw Convention*, 80 Harv.L.Rev. 497, 498–99 (1967) ("Lowenfeld and Mendelsohn"). The Convention established a presumption that air carriers are liable for damage sustained by passengers as a result of the carrier's negligent conduct, but strictly limited this liability to 125,000 Poincaré francs, approximately 8,300 dollars. Warsaw Convention Arts. 17, 20, 22.

Proponents put forth several reasons in support of the strict limitation on air carrier liability. First, they pointed out that such limits on liability were not unknown in the law, and drew an analogy to maritime law with its global limitation of a shipowner's liability which enables it to obtain necessary capital. In addition, a limitation on liability provided necessary protection of a financially weak industry and ensured that catastrophical risks would not be borne by the air carriers alone. Furthermore, the limit allowed for the inability of carriers to insure against such great risks while admitting that passengers could obtain insurance themselves. Finally, the liability limitation sought to avoid litigation by facilitating quick settlements and establishing a uniform law with respect to the

---

6. The Court has set oral argument in *King* for June 8, 1989. *King v. Eastern Airlines, Inc.*,

Order Accepting Jurisdiction and Setting Oral Argument, Case No. 73,395 (Fla. Mar. 9, 1989).

amount of recoverable damages. *See* H. Drion, *Limitation of Liabilities in International Air Law* 12–44 (1954). Whatever the validity of these arguments today,[7] the liability limitation was and remains an integral feature of the Warsaw scheme.

While the air carriers clearly were the chief beneficiaries of the Warsaw system, passengers also received some benefits. Article 23 of the Convention invalidated any attempt by the carrier tending to relieve it of liability or to fix a limit lower than that of the Convention. The Convention also shifted the burden of proof in an accident so that the carrier was presumed negligent unless it could show that it had taken all necessary measures to avoid damages or that it was impossible for it to take such measures. Warsaw Convention Art. 20. In addition, Article 25 provided that the carrier would not be able to invoke the liability limitation in cases where a plaintiff is able to prove "willful misconduct." Respected commentators have noted that "[t]he essential bargain was a shift in the burden of proof in return for a limit of liability (except in cases of willful misconduct) set at 8,300 dollars per person." Lowenfeld and Mendelsohn, 80 Harv.L. Rev. at 500; *Minutes* at 47, 51.[8]

The United States did not participate in the drafting of the Convention; it had only sent observers to Warsaw. *Minutes* at 10. After several countries ratified the Convention, however, the United States pronounced its adherence to the Warsaw Convention in 1934. On June 15, 1934, the Senate approved the Convention by voice vote. 78 Cong.Rec. 11,582 (1934); *see* Lowenfeld and Mendelsohn, 80 Harv.L.Rev. at 502.

The Convention provoked sharp debate and criticism in the United States and throughout the world almost immediately after it went into effect, and many proposals to revise it were put forth. *See* Lowenfeld and Mendelsohn, 80 Harv.L.Rev. at 502; Stuart M. Speiser and Charles F. Krause, 1 *Aviation Tort Law* § 11.17 at 669–70 (1978 and 1988 Supp.) ("Speiser and Krause"). The parties to Warsaw met at the Hague in 1955 to consider revising the Convention. The principal effect of the Hague Protocol was to double the liability limit to approximately $16,600. Hague Protocol Art. XI, *reprinted in* Andreas F. Lowenfeld, *Aviation Law Documents Supp.* 958–59 (2d ed. 1981). Opponents expressed continuing dissatisfaction with the limit of liability even under Hague, and the United States has never adhered to the Hague Protocol. *See Reed v. Wiser*, 555 F.2d 1079, 1083–88 (2d Cir.), *cert. denied*, 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977).

■ This dissatisfaction with the Warsaw regime led to the United States' formal denunciation of the Convention pursuant to Article 39 in November 1965. *See* 31 Fed. Reg. 7302 (1966). The notice of denunciation led to intense negotiations culminating in the Montreal Agreement[9] of 1966.[10] At Montreal the airlines entered into an "interim solution" (that has lasted over twenty years) whereby airlines agreed to raise the limit of liability to $75,000 and waive the due care defenses of Article 20 for flights originating, terminating, or having a stopping point in the United States. Lowenfeld and Mendelsohn, 80 Harv.L.Rev. at 602. The Montreal Agreement is not a treaty, but rather an agreement among all major international air carriers that impos-

7. *See* Kreindler, 1 *Aviation Accident Law* § 11.01[6] at 11–13; Comment, *Warsaw Convention Liability Limitations: Constitutional Issues*, 6 Nw.J.Int'l L. & Bus. 896 (1984); Comment, *The Growth of American Judicial Hostility Towards the Liability Limitations of the Warsaw Convention*, 48 J.Air L. & Com. 805 (1983).

8. In 1966, air carriers serving the United States agreed to waive their due care defenses and increase the amount of their liability to $75,000 in the Montreal Agreement, which we discuss *infra*.

9. Agreement Relating to Liability Limitations of the Warsaw Convention and the Hague Protocol, Agreement CAB 18900, approved by CAB Order No. E–28680, May 13, 1966, 31 Fed.Reg. 7302 (1966).

10. For a detailed discussion of the events leading up to Montreal and the Montreal Agreement itself, see Lowenfeld and Mendelsohn, 80 Harv. L.Rev. 497. The authors represented the United States State Department at Montreal.

es a quasi-legal and largely experimental system of liability essentially contractual in nature. *Krystal v. British Overseas Airways Corp.*, 403 F.Supp. 1322 (C.D.Cal. 1975).

■ Other international conferences have taken place since Montreal in an attempt to revise the Warsaw regime, *see* Speiser and Krause § 11.20 at 680–83; Lowenfeld, *Aviation Law Documents Supp.* at 975–1022, but today the United States remains subject to the terms of the original Warsaw Convention, as modified by the Montreal Agreement. *See* Kreindler, 1 *Aviation Accident Law* § 11.01[7] at 11–16. It is ironic that the delegates at Warsaw in no way considered their work definitive. Mr. Amedeo Giannini, Head of the Italian Delegation at Warsaw, stated that what the delegates were doing was "nothing but a first try at codification, a first effort to codify aeronautical law." *Minutes* at 32.

■ The Warsaw Convention is a self-executing treaty which requires no implementing legislation by the signatories. *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252, 104 S.Ct. 1776, 1783, 80 L.Ed.2d 273 (1984). Therefore, we must look to the terms of the Warsaw Convention itself to determine whether Eastern can be held liable to the plaintiffs in this case for their alleged emotional injuries.

A. *The Cause of Action Under Warsaw*

At the outset, we accept those cases holding that the Warsaw Convention itself creates a cause of action. In the years immediately following the United States' adherence to the Convention, most courts and commentators assumed that Article 17 created a cause of action. *See Salamon v. Koninklijke Luchtvaart Maatschappij, N.V.*, 107 N.Y.S.2d 768, 773 (Sup.Ct.1951), *aff'd mem.* 281 App.Div. 965, 120 N.Y.S.2d 917 (1st Dept.1953) ("[i]f the Convention did not create a cause of action in Art. 17, it is difficult to understand just what Art. 17 did do"); James M. Grippando, *Warsaw Convention—Federal Jurisdiction and Air Carrier Liability for Mental Injury:*

*A Matter of Limits*, 19 Geo.Wash.J.Int'l L. & Econ. 59, 64–65 (1985); Lowenfeld and Mendelsohn, 80 Harv.L.Rev. at 517.

Two seminal Second Circuit decisions in the 1950's, however, held that the Warsaw Convention did not create a cause of action. *Komlos v. Compagnie Nationale Air France*, 209 F.2d 436 (2d Cir.1953), *cert. denied*, 348 U.S. 820, 75 S.Ct. 31, 99 L.Ed. 646 (1954); *Noel v. Linea Aeropostal Venezolana*, 247 F.2d 677 (2d Cir.), *cert. denied*, 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed. 2d 262 (1957). Courts followed these decisions for two decades, and most commentators assumed the question to be closed, although not without criticizing the decisions. *See* Lowenfeld and Mendelsohn, 80 Harv.L.Rev. at 516–19; G. Nathan Calkins, Jr., *The Cause of Action Under the Warsaw Convention*, 26 J.Air L. & Com. 217, 323 (1959).

Upon reexamination of these decisions, a careful analysis of the minutes of the Convention, and an analysis of the goals of the Warsaw regime, however, the Second Circuit reversed itself in *Benjamins v. British European Airways*, 572 F.2d 913 (2d Cir. 1978), *cert. denied*, 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979). Judge Lumbard, author of the *Noel* decision, wrote the opinion for the court holding that the Warsaw Convention itself did create a cause of action for wrongful death under Article 17 and for lost baggage under Article 18. Other courts of appeals soon followed. *See Boehringer–Mannheim Diagnostics, Inc. v. Pan American World Airways, Inc.*, 737 F.2d 456 (5th Cir.1984), *cert. denied*, 469 U.S. 1186, 105 S.Ct. 951, 83 L.Ed.2d 959 (1985); *Abramson v. Japan Airlines Co.*, 739 F.2d 130 (3d Cir.1984), *cert. denied*, 470 U.S. 1059, 105 S.Ct. 1776, 84 L.Ed.2d 835 (1985); *In re Mexico City Air Crash of October 31, 1979*, 708 F.2d 400 (9th Cir. 1983). *See also* Note, *The Warsaw Convention—Does it Create a Cause of Action?*, 47 Fordham L.Rev. 366 (1978). While the Supreme Court has not expressly decided the issue, it implicitly has adopted the view that the Warsaw Convention itself creates a cause of action. In one

of only three cases [11] construing the Warsaw Convention, the Court held in *Air France v. Saks*, 470 U.S. 392, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985), that an airline passenger who became permanently deaf allegedly because of negligent maintenance and operation of the aircraft's pressurization system was not a victim of an "accident" for which the airline could be held liable under Article 17 of the Warsaw Convention. While Saks' original complaint stated a cause of action for negligence under state law, the Court ruled only on her allegations under Warsaw. 470 U.S. at 408, 105 S.Ct. at 1347.

■ In *St. Paul Insurance Co. v. Venezuelan International Airways, Inc.*, 807 F.2d 1543, 1546 (11th Cir.1987), a panel of this court held that Articles 18, 21, and 28 of the Convention created a cause of action against international air carriers for lost cargo. We extend this holding to Article 17 of the Convention as well, and hold that Article 17 creates a cause of action for personal injury.

## B. *Article 17*

Having concluded that the Warsaw Convention creates a cause of action, we now turn to the difficult question of interpreting the provisions of the Convention. Article 17 of the Convention sets forth the liability of international air carriers for injuries to passengers. Plaintiffs assert that Article 17 of the Convention provides a remedy for the injuries that they allegedly suffered—i.e., psychic injuries and emotional distress unaccompanied by physical injury.

■ In assessing the validity of their claim, we are required to determine the French legal meaning of the Convention's terms.[12] *Air France v. Saks*, 470 U.S. 392, 399, 105 S.Ct. 1338, 1342, 84 L.Ed.2d 289 (1985); *Block v. Compagnie Nationale Air France*, 386 F.2d 323, 330 (5th Cir.1967), *cert. denied*, 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968).[13] The French text of the Warsaw Convention is the only official text and the one officially adopted and ratified by the Senate. *See Minutes* at 15 (resolution designating French as official language of the conference). The unofficial United States translation, which appears at 49 Stat. 3014, was made by the State Department. *See Palagonia v. Trans World Airlines, Inc.*, 110 Misc.2d 478, 442 N.Y.S.2d 670, 672 (Sup.Ct.1978). The Supreme Court stated that the French legal meaning controls

> not because "we are forever chained to French law" by the Convention, but because it is our responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties. We look to French legal meaning for guidance as to these expectations because the Warsaw Convention was drafted in French by continental jurists.

*Saks*, 470 U.S. at 399, 105 S.Ct. at 1342 (citations omitted). *See also* Dana Stanculescu, *Recovery for Mental Harm Under Article 17 of the Warsaw Convention: An Interpretation of Lésion Corporelle*, 8 Hastings Int'l and Comp.L.Rev. 339, 347–350 (1985).

■ The original French text of Article 17 reads as follows:

11. The other Supreme Court cases on the Warsaw Convention addressed the Convention's gold-based liability limits for lost cargo, *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 247–52, 104 S.Ct. 1776, 1780–82, 80 L.Ed.2d 273 (1984), and the question whether an airline may assert the $75,000 Convention limitation on liability if the limitation is printed on passenger tickets in smaller type size than that specified in the Convention. *Chan v. Korean Air Lines, Ltd.*, 490 U.S. ——, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989).

12. The French legal meaning of the Warsaw Convention is properly before us today. The

district court discussed the issue, 629 F.Supp. at 312–14, and all parties clearly were on notice that this question of French law was relevant to the case. The briefs on appeal also addressed the issue. *See* Fed.R.Civ.P. 44.1; Charles Alan Wright and Arthur R. Miller, 9 *Federal Practice & Procedure* § 2443 at 403 (1971 and 1988 Supp.).

13. This case was decided prior to the close of business on September 30, 1981, and is binding precedent under *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981).

Le transporteur est responsable du dommage survenu en cas de mort, de blessure, ou de toute autre lésion corporelle subie par un voyageur lorsque l'accident qui a causé le dommage s'est produit à bord de l'aérnoef au cours de toutes opérations d'embarquement et de débarquement.

The unofficial United States translation of Article 17 is as follows:

The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

49 Stat. 3014, reprinted at note following 49 U.S.C. § 1502.

The incident here clearly occurred on board the aircraft. *Cf. Day v. Trans World Airlines, Inc.*, 528 F.2d 31 (2d Cir. 1975), *cert. denied*, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976); Note, *Warsaw Convention—Air Carrier Liability for Passenger Injuries Sustained Within a Terminal*, 45 Fordham L.Rev. 369 (1976). The district court held that the loss of power and preparation for ditching on Flight 855 was an "accident" for Article 17 purposes, and Eastern has not contested that ruling. 629 F.Supp. at 312; *see Saks*, 470 U.S. at 405, 105 S.Ct. at 1345 ("accident" defined as an "unexpected or unusual happening or event that is external to the passenger").

The crucial issue, then, is whether the phrase *lésion corporelle* encompasses purely emotional distress. The question whether Article 17 encompasses recovery for purely mental injuries has confounded courts and commentators for many years. An early commentary on the Warsaw Convention pointed out that Article 17 "is full of pitfalls and obscurities," and noted that "it is not clear if mental injury is covered by the Article." K.M. Beaumont, *Need for*

14. Dr. Mankiewicz is an internationally known expert on the Warsaw Convention and aviation

*Revision and Amplification of the Warsaw Convention*, 16 J.Air L. & Com. 395, 401–02 (1949).

Based upon our interpretation of the French legal meaning of the text, the concurrent and subsequent legislative history, and the case law, we conclude that the Convention provides recovery for purely emotional injuries unaccompanied by physical injury.

1. French legal meaning of the text

Because the Warsaw Convention was drafted in French and reflects a civil law liability regime, we must look to the French legal meaning of *lésion corporelle* to determine whether it contemplates recovery for mental anguish unaccompanied by physical trauma. After careful review of the cases and commentary on the meaning of *lésion corporelle*, we are persuaded that the term covers any "personal" injury —i.e., any injury suffered by the plaintiff as a person. *See Palagonia v. Trans World Airlines, Inc.*, 110 Misc.2d 478, 442 N.Y.S.2d 670, 673 (Sup.Ct.1978); Rene H. Mankiewicz, *The Liability Regime of the International Air Carrier* 145–46 (1981) ("Mankiewicz").[14] This includes emotional injury unaccompanied by any physical trauma.

While the use of the word *corporelle* would, if read literally, appear to imply that recovery for *dommage mentale* is unavailable, we are persuaded that this literal reading is unwarranted. *Cf. Burnett v. Trans World Airlines, Inc.*, 368 F.Supp. 1152, 1156 (D.N.M.1973) (applying literal French translation of *lésion corporelle* to exclude recovery for mental anguish). The literal translation of *lésion corporelle* does not fully capture its French legal meaning. *Palagonia*, 442 N.Y.S.2d at 673. *See* Mankiewicz at 141 (1981) ("While 'bodily injury' is undoubtedly a grammatically correct translation of *lésion corporelle*, it may rightly be argued that the meaning of that expression in French law and its equivalents in other civil laws are more correctly

law. *See Palagonia*, 442 N.Y.S.2d at 672.

rendered by the expression 'personal injury'."). Our study of the issue has convinced us that there is nothing in French law prohibiting compensation for any particular kind of damage, including emotional trauma, provided the damage is certain and direct. *See* Barry Nicholas, *French Law of Contract* 219–26 (1982); Marcel Plainol and George Ripert, 2 *Treatise on the Civil Law* No. 249 at 150–51 (11th ed. 1959) (Louisiana State Law Institute translation).

Nor can it be said that the express mention of the word *corporelle* by implication excludes what is *mentale.* One commentator points out that *dommage corporelle* in French law includes physical, mental, and moral damage, as well as any pecuniary loss resulting from personal injury. Georgette Miller, *Liability in International Air Transport* 122–23 (1977) ("Miller").

There is no counterpart in French law to the common law doctrine which distinguishes between physical injury (compensable), and purely mental or emotional injury unaccompanied by physical injury (not compensable). To the contrary, French law permits recovery for any damage whether material or moral. *Palagonia,* 442 N.Y.S. 2d at 673; Mankiewicz at 145, 157; Miller at 112–15. This includes damages such as medical expenses, funeral expenses, lost earnings, and pain and suffering. Mankiewicz at 157. It also includes recovery for mental suffering unaccompanied by physical injury. Mankiewicz at 145. *See also* Yvonne Blanc–Dannery, *La Convention de Varsovie et les règles du transport aérien international* 62 (Paris 1933), *quoted in* Mankiewicz at 146 ("[t]he use of the expression *lésion* after the words 'death' and 'wounding' encompasses and contemplates cases of traumatism and nervous troubles, the consequences of which do not immediately become manifest in the organism but which can be related to the accident.").[15] *See also Palagonia,* 442 N.Y.S.2d at 673 (relying on Blanc–Dannery dissertation).[16]

The wording of Article 17 strongly suggests that the drafters did not intend to exclude any particular category of damages. If *lésion corporelle* was intended to refer only to injury caused by physical impact, it is likely that the civil law experts who drafted the Warsaw Convention in 1929 would not have singled out and specifically referred to a particular case of physi-

**15.** The Blanc–Dannery thesis was written under the supervision of Dean Georges Ripert, a leading French delegate at Warsaw. *Minutes* at 6 (listing French delegation). The Second Circuit has referred to Ripert as the "dean of French writers on civil law." *Day v. Trans World Airlines, Inc.,* 528 F.2d 31 (2d Cir.1975), *cert. denied,* 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976). *See also Block v. Compagnie Nationale Air France,* 386 F.2d 323, 328 (5th Cir.1967), *cert. denied,* 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968).

**16.** While French law does not draw the sharp distinction that the common law does between emotional injuries and injuries resulting from physical trauma, it does recognize two types of legally cognizable injuries: physical injuries (*dommage materiel*) and non-physical injuries (*dommage moral*). Miller at 125. *Dommage materiel* consists of pecuniary loss resulting from injury, such as compensation for expenses or financial loss resulting from injury or death, medical and funeral expenses, and loss of earning power or income. *Dommage moral* refers to intangible losses such as pain and suffering, invasion of privacy, or disfiguration. Mankiewicz at 157. *See also* Simeon Moquet Borde & Associes, 1 Doing Business in France § 8.02[2][b] at 8–6 (1988) (physical injuries are those which are caused to the person or proper-

ty of the injured person; non-physical injuries include the pain and suffering of the injured party himself, the injury caused to the honor or emotions of the injured party (e.g. slander or the mental suffering resulting from the death of a spouse) or the loss of consortium). An accident victim generally can claim recovery for both *dommage materiel* and *dommage moral* under French law, as long as the victim can prove that the accident was the direct cause of his or her injuries. Mankiewicz at 157; Marcel Plainol and George Ripert, 2 *Treatise on the Civil Law* No. 867–868A at 470–73 (11th ed. 1959) (Louisiana State Law Institute translation). Bodily injuries, as well as mental injuries, can be compensated as *dommage moral* without any other distinction as to the origin of the injury. Miller at 126. As we have discussed, the wording of Article 17 strongly suggests that the drafters did not intend to exclude any particular category, common law or civil law, of damages. If they had, it seems likely that they would have referred to the two basic types of damages in French law, *dommage materiel* and *dommage moral*, rather than using the term *lesion corporelle*, which does not readily evoke a sharp distinction of French law. Miller at 125.

cal impact such as *blessure* ("wounding").[17] *See* Mankiewicz at 146.

 The terms of the Convention must be construed broadly in order to advance its goals. *See Stratis v. Eastern Air Lines, Inc.,* 682 F.2d 406, 412 (2d Cir. 1982); *Day v. Trans World Airlines, Inc.,* 528 F.2d 31, 35 (2d Cir.1975) ("a relatively broad construction of Article 17 is in harmony with modern theories"), *cert. denied,* 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976); *Preston v. Hunting Air Transport, Ltd.,* 1 Q.B. 454, 1 All Eng.Rep. 443, 1 Lloyd's Rep. 45 (1956) (Article 17 read to encompass not merely financial loss, but also loss suffered by children after their mother killed in air crash). One clear goal of the Convention is to maintain uniformity. *Block v. Compagnie Nationale Air France,* 386 F.2d 323, 330 (5th Cir.1967), *cert. denied,* 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968). It would clearly contravene this goal of uniformity for courts of the United States to import into Warsaw Convention jurisprudence the common law doctrine espoused by Eastern when that doctrine has no foundation in French law.

2. Concurrent and subsequent legislative history of the Warsaw Convention and conduct of the parties

 While analysis of any treaty or international agreement must begin with the text of the document and the context in which the written words are used, *see Maximov v. United States,* 373 U.S. 49, 53–54, 83 S.Ct. 1054, 1057–58, 10 L.Ed.2d 184 (1963), it is proper to refer also to records of its drafting and negotiation when interpreting a treaty when the text is subject to conflicting interpretations. *Saks,* 470 U.S. at 400, 105 S.Ct. at 1343. "[T]reaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Choctaw Nation of Indians*

*v. United States,* 318 U.S. 423, 431–32, 63 S.Ct. 672, 677–78, 87 L.Ed. 877 (1943). *See Cook v. United States,* 288 U.S. 102, 53 S.Ct. 305, 308, 77 L.Ed. 641 (1933). As Judge Wisdom stated in *Block v. Compagnie Nationale Air France,* 386 F.2d 323, 330 (5th Cir.1967), *cert. denied,* 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968), "the determination in an American court of the meaning of an international convention drawn by continental jurists is hardly possible without considering the conception, parturition, and growth of the convention."

Unfortunately, the history of the drafting of the Warsaw Convention with respect to claims for mental injury is not helpful. *See Husserl v. Swiss Air Transport Co.,* 388 F.Supp. 1238, 1249 (S.D.N.Y.1975) ("*Husserl II*"); *Burnett v. Trans World Airlines, Inc.,* 368 F.Supp. 1152, 1156–57 (D.N.M.1973); *Rosman v. Trans World Airlines, Inc.,* 34 N.Y.2d 385, 358 N.Y.S.2d 97, 105, 314 N.E.2d 848, 853–54 (1974); Grippando, 19 Geo.Wash.J.Int'l L. & Econ. at 84–85. The drafters of the Convention in 1929 did not discuss whether Article 17 encompassed recovery for mental injuries. *See generally Minutes.* The Senate did not address the issue when it adhered to the Convention in 1934. *See* 78 Cong.Rec. 11,577–82 (1934).

 Subsequent action by the contracting countries to the Warsaw Convention, however, supports the conclusion that Article 17 encompasses recovery for mental anguish. When interpreting a treaty, reference to the subsequent interpretations by its signatories is appropriate to help determine the meaning of an ambiguous provision. *Air France v. Saks,* 470 U.S. at 403, 105 S.Ct. at 1344. The conduct of the parties of a treaty is relevant in ascertaining the proper construction to accord the treaty's provisions. *Id.; Pigeon River Improvement Slide & Boom Co. v. Charles W. Cox, Ltd.,* 291 U.S. 138, 158–63, 54 S.Ct. 361, 366–67, 78 L.Ed. 695 (1934); *Day v. Trans World Airlines, Inc.,* 528 F.2d 31,

---

17. *But see Burnett v. Trans World Airlines, Inc.,* 368 F.Supp. 1152, 1156 (D.N.M.1973) (court rejected the argument that the term *blessure* itself as used in Article 17 encompassed emotional injury). *See Husserl v. Swiss Air Transport Co.,* 351 F.Supp. 702, 708 (S.D.N.Y.1972) ("*Husserl I*"), *aff'd* 485 F.2d 1240 (2d Cir.1973).

35–36 (2d Cir.1975), *cert. denied*, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976).

Actions by the contracting states suggest that the translation of *lésion corporelle* as "bodily injury" may have placed too narrow a meaning on the French term. For example, one commentator has pointed out that the official German translation of Article 17 rendered the term *lésion corporelle* as "any infringement on the health...." This translation may more correctly reflect the understanding of the expression *lésion corporelle* by the delegates at Warsaw. Mankiewicz at 146.

The signatory airlines at Montreal in 1966 did not discuss whether Article 17 provided recovery for mental injury. Andreas F. Lowenfeld, *Hijacking, Warsaw, and the Problem of Psychic Trauma*, 1 Int'l L.J. of Syracuse 345, 347–48 (1973). The focus concerned raising the limit of liability to $75,000 and the carriers' agreement to waive their due care defense. However, the Montreal Agreement used language which is relevant. In paragraph 1 of the Agreement, the airlines agreed to include certain language in their conditions of carriage—"[t]he limit of liability for each passenger for death, wounding, or other bodily injury shall be the sum of $75,000." In paragraph 2, the airlines agreed to include certain language on each ticket as a notice to passengers—"the liability of ... [name of carrier] ... for death or personal injury to passengers is limited in most cases to proven damages not to exceed $75,000 per passenger." The Civil Aeronautics Board Order which approved the terms of the Montreal Agreement also uses the term "personal injury" interchangeably with the term "bodily injury" when referring to compensable injuries under the Warsaw regime.[18] 31 Fed.Reg. 7302 (1966). The actual notice issued by the airlines to passengers uses the term "personal injury." *See Krystal v. British Overseas Airways Corp.*, 403 F.Supp. 1322, 1323 (C.D.Cal.1975). The court in *Krystal* found this to be dispositive on the question whether Article 17 encompassed claims for

purely psychic injury. On the other hand, a participant at the Montreal conference has asserted that "no legal significance should be attached to this change in wording, which was occasioned solely by the need to draft an intelligible notice in readable type in the space provided by a ticket booklet." Lowenfeld, 1 Int'l L.J. of Syracuse at 347 n. 7.

While we do not find the change in wording on the ticket form or the interchangeable uses of "bodily injury" and "personal injury" to be dispositive, neither do we completely discount them. It seems clear to us that there is significance in the fact that the Montreal Agreement itself and the Civil Aeronautics Board Order use the two terms interchangeably. It is also significant that the only document which is actually delivered to passengers informs them that the airline's liability is limited in cases of death or "personal injury," not merely "bodily injury." This is evidence of "the conduct of the parties to the Convention and the subsequent interpretations of the signatories" which, according to the Supreme Court in *Saks*, 470 U.S. at 403, 105 S.Ct. at 1344, helps clarify the meaning of the terms. *See also Day v. Trans World Airlines, Inc.*, 528 F.2d 31 (2d Cir.1975) (construing Warsaw Convention in light of Montreal Agreement), *cert. denied*, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976); *Board of County Commissioners of Dade County, Florida v. Aerolineas Peruanasa, S.A.*, 307 F.2d 802, 806–07 (5th Cir.1962) (must consider intent of the parties in construing treaty such as the Warsaw Convention), *cert. denied*, 371 U.S. 961, 83 S.Ct. 543, 9 L.Ed.2d 510 (1963); *St. Paul Insurance Co. v. Venezuelan International Airways, Inc.*, 807 F.2d 1543, 1546 (11th Cir.1987). Thus, we consider this evidence as another factor in favor of allowing recovery for mental injuries.

In addition, the authentic English text of Article 3(1)(c) of the Convention, as amended at The Hague, used the expression "personal injury," while the authentic French text of the amended article retained the

---

18. The CAB order uses the phrase "death, wounding, or other bodily injury" three times.

The phrase "personal injury" is repeated four times. 31 Fed.Reg. 7302 (1966).

expression *"lésion corporelle."* Hague Protocol Art. III, *reprinted in* Lowenfeld, *Aviation Law Documents Supp.* at 956. *See* Mankiewicz at 141, 178.

Another important piece of subsequent "legislative history" is the Guatemala City Protocol. *Air France v. Saks,* 470 U.S. at 404–05, 105 S.Ct. at 1344–45 (using Guatemala City Protocol to interpret meaning of "accident" in Article 17); *Day v. Trans World Airlines, Inc.,* 528 F.2d 31 (2d Cir. 1975), *cert. denied,* 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976). The Protocol was drafted in three authentic texts, English, French, and Spanish, although in cases of conflict the French text is to be controlling. Guatemala City Protocol Art. XXVI, *reprinted in* Lowenfeld, *Aviation Law Documents Supp.* at 984. The English text of the Protocol has substituted "personal injury" for "wounding or other bodily injury" in the translation of Article 17. The French text has retained the expression *lésion corporelle.* The fact that an official English translation of Article 17 made by the drafters at The Hague differs from the unofficial American translation made by the State Department casts doubt on the accuracy of the unofficial American translation. *See* Miller at 123.

The United States Senate has not ratified the Guatemala City Protocol,[19] so it is important not to overestimate its importance. Grippando, 19 Geo.Wash.J.Int'l L. & Econ. at 85 n. 158; Speiser and Krause § 11.20 at 680–83. Nor has the Senate ratified the

Hague Protocol or Montreal Protocols 3 and 4,[20] which also would have adopted the change in wording of the English translation of Article 17 from "wounding ... or any other bodily injury" to "personal injury." While these Protocols "do not govern the disposition of this case" because of the lack of Senate ratification, nevertheless they are evidence of "the conduct of the parties and the subsequent interpretations of the signatories." *Saks,* 470 U.S. at 403, 105 S.Ct. at 1344. This evidence provides additional support for the conclusion that the French legal meaning of *de mort, de blessure, ou de toute autre lésion corporelle* is "death or personal injury" rather than "bodily injury."

### 3. Cases interpreting Article 17

Prior judicial construction of Article 17, while helpful, often has been flawed. In the 1970's an explosion of terrorist activities led to litigation over the type of injuries compensable under Article 17. Hijackers often did not physically harm passengers, but the passengers of hijacked aircraft understandably experienced extreme terror and psychological trauma. Courts were thus presented with the difficult question whether the Warsaw Convention contemplated recovery for psychological injuries alone. *See* Kreindler, 1 *Aviation Accident Law* § 11.03[2][b] at 11–42.

Several cases have held that Article 17 of the Convention does not allow recovery for

**19.** The Guatemala City Protocol was drafted in such a way as to prohibit its ratification without the United States' assent, in order to avoid a repetition of the Hague Protocol situation. *See* Mankiewicz at 9–10. The fact that the Senate has not ratified these modifications of the Warsaw system is attributable to a reluctance to accept any damage limitations at all, not to a desire to limit recoverable damages to purely physical injury. *See* 129 Cong.Rec. S2237, S2270–79 (Daily ed. March 8, 1983); *In re Korean Air Lines Disaster of September 1, 1983,* 664 F.Supp. 1463, 1469–70 (D.D.C.1985), *aff'd,* 829 F.2d 1171 (D.C.Cir.1987), *aff'd sub nom. Chan v. Korean Air Lines, Ltd.,* 490 U.S. ——, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989); Lee S. Kreindler, *A Plaintiff's View of Montreal,* 33 J.Air L. & Com. 528, 528–29 (1967); Grippando, 19 Geo. Wash.J.Int'l L. & Econ. at 85–86 n. 158. *See also Reed v. Wiser,* 555 F.2d 1079, 1087 (2d Cir.) (discussing Hague Protocol, court stated that

"the only reason for the United States' refusal to ratify it was its dissatisfaction with the low level of the carriers' liability limitations, not the other provisions of the Protocol."), *cert. denied,* 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977).

**20.** Drafted in 1975, Montreal Protocols 3 and 4 were intended to amend the Warsaw Convention as amended by The Hague and Guatemala City Protocols. Montreal Protocol No. 3 replaced the Poincare franc, in which limits of liability had been expressed, with the Special Drawing Right of the International Monetary Fund. Montreal Protocol No. 4 was intended to align the air carriers' liability for the carriage of goods with that established for the carriage of passengers and registered baggage by the Guatemala City Protocol. *See* Kreindler, *Aviation Law Documents Supp.* at 985–1001.

purely emotional or psychological injuries unaccompanied by physical trauma. Probably the leading proponent of that view is *Rosman v. Trans World Airlines, Inc.,* 34 N.Y.2d 385, 358 N.Y.S.2d 97, 314 N.E.2d 848 (1974), in which the New York Court of Appeals held that mental injury was not compensable under Warsaw in the absence of physical trauma. The plaintiffs in *Rosman* were passengers aboard a TWA flight which was hijacked while en route from Tel Aviv, Israel, to New York and forced to land in the desert near Amman, Jordan. The passengers were held captive for six days by armed Arab guerillas, but were ultimately released by their captors and returned to New York. The plaintiffs claimed that they suffered extreme psychic trauma as well as physical harm due to the harsh desert conditions. The court held that their claims for recovery based solely on psychic injury were not compensable under Article 17. 358 N.Y.S.2d at 110, 314 N.E.2d at 857. The court reasoned that the ordinary meaning of "bodily injury," as opposed to mental injury, connoted "palpable, conspicuous physical injury." 358 N.Y.S.2d at 107, 314 N.E.2d at 855. "Only by abandoning the ordinary and natural meaning of the language of article 17," the court argued, "could we arrive at a reading of the terms 'wounding' or 'bodily injury' which might comprehend purely mental suffering without physical manifestations." 358 N.Y.S.2d at 107, 314 N.E.2d at 855.[21]

The *Rosman* analysis was flawed, however, because it failed to consider the French legal meaning of the language in Article 17. The court noted that there was "absolutely no dispute over the proper translation of the liability provisions of the Convention," 358 N.Y.S.2d at 103, 314 N.E. 2d at 852, and that French law therefore was irrelevant in interpreting the Convention once a proper translation was agreed upon. 358 N.Y.S.2d at 105, 314 N.E.2d at 854. In light of the Supreme Court's holding in *Saks* that the French legal meaning must govern our interpretation of Warsaw, and in light of the considerable negative commentary of *Rosman's* approach, we must reject the *Rosman* analysis. See *Saks,* 470 U.S. at 399, 105 S.Ct. at 1342; Mankiewicz at 141–45; Miller at 117–22; J. Kathryn Lindauer, *Recovery for Mental Anguish Under the Warsaw Convention,* 41 J.Air.L. & Com. 333, 336–38, 340 (1975).

Another case which held that psychic injury unaccompanied by physical trauma is not compensable under the Warsaw Convention is *Burnett v. Trans World Airlines, Inc.,* 368 F.Supp. 1152 (D.N.M.1973). The court in *Burnett* applied the French language meaning of "bodily injury," and determined that the definition of *lésion corporelle* was "l'atteinte a l'integrite physique" ("an infringement of physical integrity"). This definition, the court stated, "gives not the slightest indication that mental injuries are to be included within its domain." 368 F.Supp. at 1156. The court also rejected the plaintiffs' contention that *blessure* encompasses mental anguish. The court reasoned that

The critical words of Article 17, "mort, de blessure, and ou de toute autre lesion corporelle" must be examined together in order to ascertain their contextual mean-

---

21. Two cases have addressed actions for mental anguish not involving a hijacking. In *Kalish v. Trans World Airlines, Inc.,* 89 Misc.2d 153, 390 N.Y.S.2d 1007 (1977), the Civil Court of the City of New York, Queens County, followed *Rosman* and held that a plaintiff who was trampled by other passengers who stepped on and jostled her after panic ensued among passengers trapped inside an airliner with an engine on fire was entitled to recover for mental and emotional trauma resulting from her experience.

Also, the Kentucky Court of Appeals held that a passenger cannot recover damages for mental anguish under the Convention arising out of losing a suitcase and its contents. *Trans World Airlines, Inc. v. Christophel,* 500 S.W.2d 409 (Ky. App.1973). *Christophel* did not involve an "accident" within the meaning of Article 17 and hence has no application here.

It is important to note that today we hold only that Article 17 authorizes recovery for mental anguish unaccompanied by physical trauma only when there has been an "accident" sufficient to trigger the application of Article 17. We express no opinion on claims for mental distress not falling within the confines of Article 17. See Grippando, 19 Geo.Wash.J.Int'l L. & Econ. at 60 n. 5; J. Kathryn Lindauer, *Recovery for Mental Anguish Under the Warsaw Convention,* 41 J.Air. L. & Com. 333, 333 n. 2 (1975) (noting the possibility of actions for mental distress not based on an "accident").

ing. Although the *French–English Dictionary of Legal Terms* by Jules Jeraute defines "blessure" to include not only a wound but also hurt or injury, when the term is modified by the subsequent phrase of the provision, it seems apparent that the drafters utilized the word in solely a physical sense.

368 F.Supp. at 1156. The court in *Husserl v. Swiss Air Transport Co.*, 351 F.Supp. 702, 708 (S.D.N.Y.1972) (*"Husserl I"*), *aff'd per curiam* 485 F.2d 1240 (2d Cir. 1973), based on similar reasoning, also stated in dicta that mental anguish alone is not compensable under Article 17. The district court in this case relied almost exclusively on *Burnett* in reaching its conclusion that Article 17 does not allow recovery for mental injury. 629 F.Supp. at 313–14.

While the court in *Burnett* purported to apply the French *legal* meaning of Article 17, 368 F.Supp. at 1155, it actually considered only the *linguistic* meaning of the French words of Article 17 at issue. *See* Kreindler, 1 *Aviation Accident Law* § 11.03[2][b] at 11–43. We therefore find its analysis unpersuasive. Furthermore, the plaintiffs' action in *Burnett* was founded on state law, 368 F.Supp. at 1153, not on the Warsaw Convention itself, which also places its conclusion on somewhat uncertain footing.

The court in *Burnett* also considered prior drafts of the Convention in concluding that the Convention did not encompass recovery for purely emotional injuries. Eastern asks us to apply those drafts the way the *Burnett* court did, but we view the drafting history of the Convention somewhat differently than do Eastern and the *Burnett* court. The First International Conference on Private Air Law, the predecessor to the Warsaw Convention, initially stated that "[t]he carrier is liable for accidents, losses, breakdowns and delays." [22] The *Burnett* court stated that this language would encompass recovery for both physical and mental injuries, quoting remarks by a French scholar which stated that French law at the time contemplated recovery against a common carrier:

> even in the cases where the carrier in failing to perform its contractual obligations infringed the emotional condition of the passenger: his sentiments of affection in delaying his arrival at funeral ceremonies, the comfort to which he is entitled by placing him in a baggage car, and even for the simple inconvenience of delay in arrival.

Henri Nazeaud, Leon Mazeaud, and Andre Tunc, *Traité Théorique et Pratique de la Responsabilité Civile Délictuelle et Contractuelle* 416–17 (5th ed.1957), *quoted in Burnett*, 368 F.Supp. at 1157.

The preliminary draft of the Convention itself, adopted in May 1928 by the CITEJA, the interim committee formed after the Paris Conference of 1925, placed all sources of liability against the carrier in one article, Article 21, which provided that:

> The carrier shall be liable for damage sustained during carriage:
>
> (a) in the case of death, wounding, or any other bodily injury suffered by a traveler;
>
> (b) in the case of destruction, loss, or damage to goods or baggage;
>
> (c) in the case of delay suffered by a traveler, goods, or baggage.

Warsaw Convention, Preliminary Draft, reprinted in *Minutes* at 264–65.[23] The court

---

**22.** "Le transporteur est responsable des accidents, pertes, avaries et retards." *See Burnett*, 368 F.Supp. at 1157 (quoting French translation).

**23.** The French translation of proposed Article 21 read as follows:

Le transporteur est responsable du dommage survenu pendant le transport:

(a) en cas de mort, de blessure ou de toute autre lesion corporelle subie par ur voyageur;

(b) en cas de destruction, perte ou avarie de marchandises ou de bagages;

(c) en cas de retard subi par un voyageur, des marchandises ou des bagages.

*See* Miller at 124 n. 74; *Burnett*, 368 F.Supp. at 1157 (reprinting translation).

In the final version of the Convention, the former Article 21 was split into three articles governing carrier liability for injuries to persons, damage or loss of goods, and delay, Articles 17, 18, and 19. The drafters viewed this change purely as a matter of form, and did not intend the change to affect actual carrier liability. *See Minutes* at 84, 205–06 ("it's not a question of new articles but of a new numbering of

in *Burnett* placed great emphasis on this change, stating that

> By thus restricting recovery to bodily injuries, the inference is strong that the Convention intended to narrow the otherwise broad scope of liability under the former draft and preclude recovery for mental anguish alone. Had the delegates desired otherwise, there would have been no reason to so substantially modify the proposed draft of the First Conference.

368 F.Supp. at 1157. We believe the court in *Burnett* was too literal in its interpretation of the new language and overemphasized the importance of the change in wording, at least with regard to the type of compensable injuries. There is no evidence in the negotiating history of the Convention suggesting that the drafters intended to foreclose recovery for any particular type of injury; the drafters simply did not discuss the issue of whether purely emotional injury would be compensable under the Convention. To conclude that this drafting change dealt with a question as important as the exclusion of particular forms of damages, as the court in *Burnett* did, is to place far too much weight on an ambiguous piece of the drafting history of the Convention. *See* Miller at 123–25.

▆▆▆ There is a more fundamental problem with the *Rosman* and *Burnett* analysis, the analysis that Eastern urges upon this court. In drawing a sharp distinction between injury caused by physical impact and purely mental injury, the courts in *Rosman* and *Burnett* have taken the common law's distinction between mental and physical injuries [24] and imposed it on Article 17 of the Warsaw Convention, a cre-

ation of civil lawyers. *See, e.g., Minutes* at 66, 85; *Block v. Compagnie Nationale Air France*, 386 F.2d 323, 331 (5th Cir.1967), *cert. denied*, 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968). As demonstrated earlier in this opinion, there is no such distinction in French law or other civil law systems. We are convinced that *Rosman* and *Burnett* inappropriately imported the common law doctrine.

Other cases have held that Article 17 of the Warsaw Convention does contemplate recovery for mental anguish unaccompanied by physical trauma.

The leading case in this line of cases is *Husserl v. Swiss Air Transport Co.*, 388 F.Supp. 1238 (S.D.N.Y.1975) (*"Husserl II"*). In *Husserl II*, the court rejected the argument that the French legal meaning of Article 17 governs recovery for mental anguish, and concluded that conflicting interpretations of the term "bodily injury" were "unconvincing and inconclusive." 388 F.Supp. at 1250. The court looked to the purposes of the Warsaw Convention and the intent of its drafters to delineate a comprehensive international scheme of recovery and concluded that

> To effect the treaty's avowed purpose, the types of injuries enumerated should be construed expansively to encompass as many types of injury as are colorably within the ambit of the enumerated types. Mental and psychosomatic injuries are colorably within that ambit and are, therefore, comprehended by Article 17.

388 F.Supp. at 1250.

We agree with the court's conclusion in *Husserl II* that Article 17 encompasses re-

---

the articles") (remarks of Mr. Giannini, President of the Drafting Committee).

**24.** The common law has long been reluctant to award recovery for mental disturbance. Three principal concerns prompted this judicial concern: (1) the problem of permitting recovery for harm that is often temporary in nature; (2) the danger that such claims will be feigned; and (3) the perceived unfairness of imposing heavy burdens upon a defendant for harm the consequences of which appear remote from the wrongful act. W. Page Keeton, Dan B. Dobbs, Robert E. Keeton, David G. Owen, *Prosser and Keeton on Torts* § 54 at 360–61 (5th ed. 1984)

("Prosser"). This concern resulted in the "impact rule," which allowed recovery for emotional injury only if accompanied by some physical infringement upon the plaintiff's person. There has been a continuous relaxation of the impact rule in the United States. *See, e.g., Battalla v. State of New York*, 10 N.Y.2d 237, 219 N.Y.S.2d 34, 176 N.E.2d 729 (1961) (holding that mental anguish standing alone could be compensated); Prosser § 54 at 362–65 (noting development of the law); Lindauer, 41 J.Air L. & Com. at 342 (noting that "the impact rule has been overruled in almost every jurisdiction").

covery for mental injury, but the Supreme Court's mandate in *Saks* requires us to analyze more deeply the French legal meaning of Article 17. Furthermore, *Husserl II* was decided before *Benjamins v. British European Airways*, 572 F.2d 913 (2d Cir.1978), *cert. denied*, 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979), and its analysis was based on the premise that the Warsaw Convention merely imposed limits on state law causes of action. The court held that "mental injury alone should be compensable, if the otherwise applicable substantive law provides an appropriate cause of action." 388 F.Supp. at 1251. *See also Tarar v. Pakistan International Airlines*, 554 F.Supp. 471, 480 (S.D.Tex. 1982).[25] For the reasons set forth above, we cannot subscribe to this analysis. The *Husserl II* court's statements regarding the policies and goals of Warsaw, however, are instructive.

Other courts have followed *Husserl II* but have added little to its analysis. *See Borham v. Pan American World Airways*, 19 Aviation Cases 18,236 (CCH), 1986 WL 2974 (S.D.N.Y. March 5, 1986); *Karfunkel v. Compagnie Nationale Air France*, 427 F.Supp. 971 (S.D.N.Y.1977); *Krystal v. British Overseas Airways Corp.*, 403 F.Supp. 1322 (C.D.Cal.1975).

The court in *Palagonia v. Trans World Airlines, Inc.*, 110 Misc.2d 478, 442 N.Y. S.2d 670, 675 (Sup.Ct.1978), engaged in an exhaustive analysis of the French legal meaning of Article 17, relying on expert testimony to conclude that *lésion corporelle* includes mental injury as recoverable damage even absent physical trauma. Eastern argues that *Palagonia* demonstrates only that there is some scholarly disagreement over the meaning of Article 17, and correctly points out that the court did not examine the prior and subsequent history of the Convention in arriving at its conclusion. However, we have studied those materials and find that they support *Palagonia*'s analysis and conclusion that mental injury alone is recoverable. We find the *Palagonia* analysis persuasive.

Finally, we conclude that our interpretation is supported by the policies underlying the Convention. Our interpretation is consistent with the policy of the Convention to provide a comprehensive scheme of rules governing international air travel. *Husserl II*, 388 F.Supp. at 1250. It is also consistent with the important goal of the Convention to ensure uniformity, both in matters of documentation and matters of liability. *Id.* at 1250. Were we to accept Eastern's contention that Article 17 does not encompass recovery for emotional trauma, the plaintiffs nonetheless might[26] be able to successfully pursue their state law cause of action for intentional infliction of emotional distress. *See* Part II, *supra.* Such a state law cause of action would not be uniformly available. More important, this might[27] put the plaintiffs in position to recover damages for emotional trauma

---

**25.** Plaintiffs cite *Tarar* for the proposition that Article 17 authorizes the recovery of damages for mental distress and other purely psychic trauma. Eastern correctly points out that *Tarar* arose under Article 19 of the Warsaw Convention which deals with damages due to delay in transporting passengers, baggage, or goods. In addition, the court in *Tarar* held that the Warsaw Convention did not create a cause of action and applied Texas law in determining that the plaintiffs stated a cause of action for intentional infliction of emotional distress when the air carrier was negligent in transporting the remains of plaintiffs' decedent to his homeland. 554 F.Supp. at 478–80.

**26.** We emphasize that we expressly do not decide whether the state law cause of action would be preempted if we had held that the Warsaw Convention does *not* encompass a cause of action for purely mental injury. That preemption issue is different from the one we address in Part IV. That is, in Part IV, we decide that there is preemption in light of our holding that the Convention does create a cause of action encompassing purely mental injury. The preemption issue we do not decide is more difficult and subtle than the one we do decide, and in fact in a related case the District Court of Appeal of Florida, Third District, has held that air travelers may "avail themselves of remedies available under local law when the Warsaw Convention fails to provide a cause of action." *King v. Eastern Airlines, Inc.*, 536 So.2d 1023, 1031 (Fla. 3d D.C.A.1987). Our statement in text that plaintiffs *might* be able to pursue their state law cause of action without a $75,000 limit on liability is of course a possibility only if the Florida court is correct.

**27.** *See* note 26, *supra.*

which exceeded the $75,000 limit set by the Montreal Agreement. It hardly seems consistent with the intent of the Convention to place a strict cap of $75,000 on damages for death or harm resulting from physical impact while allowing unlimited recovery for purely emotional or psychological injuries.

### 4. Summary

After careful consideration of the French legal meaning of the treaty terms, the concurrent and subsequent legislative history and conduct of the parties, the case law and the policies underlying the Warsaw Convention, we are persuaded that Article 17 provides recovery for purely mental injuries unaccompanied by physical trauma. It is important to note that this does not mean that courts will allow recovery for every claim for mental injury up to $75,000. The damages actually sustained by the plaintiffs must be proved.

## IV. PREEMPTION

We are bound by the Florida court's decision that the facts of this case state a claim under Florida law for intentional infliction of emotional distress.[28] Part II, *supra*. In addition, we hold today that Article 17 creates a cause of action for emotional injuries unaccompanied by physical trauma. Part III, *supra*. Because both state law and the Warsaw Convention may allow recovery for these alleged injuries, we are asked to determine whether the Convention preempts the plaintiffs' state law cause of action.

■ Plaintiffs argue that Article 17 of the Convention does not preempt all remedies available to an international air traveler; rather, they contend, it excludes recovery based on local law only for injuries which are inconsistent with the Warsaw Convention. The plaintiffs concede, as they must, that where local law conflicts with the Convention, the rules of the Con-

vention must prevail. Eastern contends that the Warsaw Convention provides the exclusive avenue of recovery for passengers involved in an "accident" within the meaning of Article 17, and thus that all of plaintiffs' state law claims are barred.

■ As an international treaty accepted by the United States, the Warsaw Convention is binding. *Dalton v. Delta Airlines, Inc.,* 570 F.2d 1244, 1246 (5th Cir.1978). The Supremacy Clause of the United States Constitution provides that "all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI. Any state law in conflict with a treaty of the United States is invalid. *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 157–58, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978). Therefore, the Warsaw Convention preempts any state law which is inconsistent with it. *Highlands Insurance Co. v. Trinidad and Tobago (BWIA International) Airways Corp.,* 739 F.2d 536, 537 n. 2 (11th Cir.1984) ("Warsaw Convention preempts local law in areas where it applies"); *Burnett v. Trans World Airlines, Inc.,* 368 F.Supp. 1152, 1155 (D.N.M.1973).

Courts have not hesitated to apply this principle in Warsaw Convention cases. In *Butler v. Aeromexico,* 774 F.2d 429 (11th Cir.1985), for example, this court held that the district court did not err in awarding compensatory damages to crash victims when Alabama wrongful death law provided only for recovery of punitive damages. The court stated that Alabama law "conflicts with the tenor of the Warsaw Convention, which contemplates compensation for victims of air disasters." 774 F.2d at 431. *See In re Aircrash in Bali, Indonesia On April 22, 1974,* 684 F.2d 1301, 1307–08 (9th Cir.1982) (court held that "Califor-

---

**28.** If the Supreme Court of Florida, which has accepted jurisdiction over the *King* case, holds that a cause of action for intentional infliction of emotional distress does not exist under Florida law, the district court will be bound by that

holding on remand. Of course, if there is no state law cause of action, there would be no question of preemption. Our discussion of the preemption issue would become moot. *See* Part II, *supra.*

nia law is preempted by the Warsaw Convention to the extent that California law would prevent the application of the Convention's limitation on liability"), *later appeal*, 871 F.2d 812 (9th Cir.1989); *Kapar v. Kuwait Airways Corp.*, 845 F.2d 1100, 1104 (D.C.Cir.1988) ("admiralty cases involving international air transportation *must* satisfy the Convention's requirements") (emphasis in original). These cases and the Supremacy Clause itself squarely stand for the proposition that when state law conflicts with a provision of the Warsaw Convention, the rules of the Convention must govern.

▮ Conversely, where the Warsaw Convention does not apply at all—for example, to an injury suffered after disembarkation[29]—causes of action based on state law can go forward. The Convention does not prohibit state or federal causes of action based on situations which the Convention was not intended to govern. The title of the Convention itself suggests that it was not intended to cover the entire relationship between air carriers and passengers—the Convention was to unify "Certain Rules Relating to International Transportation by Air," not *all* rules relating to international transportation by air. The delegates to the Convention carefully chose to include this qualification in the title.[30] In those aspects of the passenger-carrier relationship which the Convention does not address, it does not apply at all, and local law must govern. *See* Mankiewicz at 13–15.

Courts considering this question have adhered to this distinction, often permitting claims against air carriers to proceed on other grounds after concluding that the Warsaw Convention did not apply.[31] *See* Kreindler, 1 *Aviation Accident Law* § 11.07 at 11–93, 94; *Abramson v. Japan Airlines Co., Ltd.*, 739 F.2d 130 (3d Cir. 1984) (where Article 17 of the Warsaw Convention was not applicable because there was no "accident," the court held that there was no preemption of plaintiff's state law cause of action for negligent failure to assist a sick passenger suffering from an attack associated with a preexisting hernia condition), *cert. denied*, 470 U.S. 1059, 105 S.Ct. 1776, 84 L.Ed.2d 835 (1985).[32]

▮ We easily conclude that this case falls in the first category—i.e., it is a case where the Convention applies and preempts inconsistent local law. The engine failure in question was an "accident" within the meaning of the Convention, and we have determined in Part III that Article 17 applies in this case and provides recovery for mental injuries unaccompanied by physical impact. Where the Convention applies, it preempts any inconsistent state law provision. *Butler v. Aeromexico*, 774 F.2d 429 (11th Cir.1985). Plaintiffs' brief concedes, and we agree, that Eastern will be entitled to invoke the $75,000 per passenger limita-

---

**29.** *See Martinez Hernandez v. Air France*, 545 F.2d 279 (1st Cir.1976), *cert. denied*, 430 U.S. 950, 97 S.Ct. 1592, 51 L.Ed.2d 800 (1977).

**30.** *Minutes* at 188 (statement of Mr. Giannini, President of the drafting committee) ("We have adopted the title: 'Convention for the Unification of Certain Rules Relating to International Carriage by Air'. This suffices to say that this Convention does not provide for the entire matter and gives satisfaction to certain delegations such as the Czechoslovak Delegation, which asked that the word 'Certain' be added."). *See Minutes* at 134–35; 176; 182–83 (statements emphasizing that the Convention was not intended to govern completely international air transportation).

**31.** This is the approach taken by the Florida Court of Appeals in the *King* case. After it held that the Convention did not create a cause of action for emotional injury, the court held that the Convention did not preempt the state law claim for intentional infliction of emotional distress. *See* 536 So.2d at 1030–31.

**32.** *See also Wolgel v. Mexicana Airlines*, 821 F.2d 442 (7th Cir.) (action for discriminatory "bumping" from flight; held that since plaintiffs sought damages for the bumping itself under the Federal Aviation Act rather than incidental damages due to delay, the claims fell outside the scope of the Warsaw Convention), *cert. denied* —— U.S. ——, 108 S.Ct. 291, 98 L.Ed.2d 251 (1987); *Schmidkunz v. Scandinavian Airlines System*, 628 F.2d 1205, 1207 (9th Cir.1980) (reaching plaintiff's negligence claim after disposing of her Warsaw claim); *Martinez Hernandez v. Air France*, 545 F.2d 279, 284 (1st Cir. 1976) (holding that passenger injured after disembarkation is left "to remedies of local law"), *cert. denied*, 430 U.S. 950, 97 S.Ct. 1592, 51 L.Ed.2d 800 (1977).

tion and that the other provisions of the Convention will apply. Therefore, to the extent that the cause of action for intentional infliction of emotional distress recognized under Florida law conflicts with the cause of action we recognized under Article 17 of the Convention, Florida law is preempted.

Eastern suggests that we hold that the Convention provides the exclusive source of a right to recovery and thus completely preempts state law causes of action in acci-

dents involving international air transportation. At this stage of the case, however, we determine only that the Convention preempts those aspects of plaintiffs' state law claims which are inconsistent with the Convention. We decline to speculate further on the issue of whether the Warsaw Convention entirely preempts state law causes of action once its provisions are triggered by an "accident" within the meaning of Article 17.[33] The plaintiffs and Eastern concede that the Convention's limi-

---

**33.** It is evident that where the Convention applies it preempts inconsistent local law. Several courts have gone farther, however, and have concluded that the Convention is to be both the exclusive avenue of recovery and the exclusive remedy in the areas it governs. *See Boehringer– Mannheim Diagnostics, Inc. v. Pan American World Airways, Inc.,* 737 F.2d 456, 459 (5th Cir.1984) (court refused to award attorney's fees under Texas law and held that the Convention preempted plaintiff's negligence cause of action, stating that "[h]aving concluded that the Warsaw Convention creates the controlling cause of action, we further conclude that it preempts state law in the areas covered;" court implied that all state law causes of action would necessarily conflict with the Convention due to the interests of national and international uniformity and must therefore be preempted), *cert. denied,* 469 U.S. 1186, 105 S.Ct. 951, 83 L.Ed.2d 959 (1985); *Abramson v. Japan Airlines, Co.,* 739 F.2d 130, 134 (3d Cir.1984) (court indicated that it would hold that the Convention is the exclusive basis for recovery), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1776, 84 L.Ed.2d 835 (1985); *Benjamins v. British European Airways,* 572 F.2d 913, 919 (2d Cir.1978) ("the desirability of uniformity in international air law can best be recognized by holding that the Convention, otherwise universally applicable, is also the universal source of a right of action"), *cert. denied,* 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979); *Stanford v. Kuwait Airlines Corp.,* 705 F.Supp. 142 (S.D.N.Y.1989) ("[t]he terms of the Warsaw Convention exclusively govern the rights and liabilities of the parties"); *Harpalani v. Air India, Inc.,* 622 F.Supp. 69, 73 (N.D.Ill.1985) (Warsaw claim provides exclusive remedy for delays in air transportation, plaintiffs' non-Warsaw claims dismissed), *disapproved on other grounds Wolgel v. Mexicana Airlines,* 821 F.2d 442, 445 (7th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 291, 98 L.Ed.2d 251 (1987); *Jahanger v. Purolator Sky Courier,* 615 F.Supp. 29, 32 (E.D.Pa. 1985) ("[w]here the Warsaw Convention applies, its limitations and theories of liability are exclusive"); *In re Air Crash Disaster at Warsaw, Poland on March 14, 1980,* 535 F.Supp. 833, 844–45 (E.D.N.Y.1982) ("Warsaw Convention specifically controls and exclusively governs any and all claims for damages arising out of the death or

injury of a passenger engaged in international air transportation, and plaintiffs cannot maintain a separate wrongful death action for damages under California law"), *aff'd* 705 F.2d 85 (2d Cir.), *cert. denied sub nom. Polskie Linie Lotnicze (LOT Polish Airlines) v. Robles,* 464 U.S. 845, 104 S.Ct. 147, 78 L.Ed.2d 138 (1983).

Some courts have taken the contrary view, holding that the Convention merely preempts inconsistent provisions of state law. *See Johnson v. American Airlines, Inc.,* 834 F.2d 721, 723 (9th Cir.1987) ("[s]tate-law claims allowing damages for injuries to goods in international air transportation can only be maintained subject to the conditions and limits outlined in the Warsaw Convention"); *In re Mexico City Air Crash of October 31, 1979,* 708 F.2d 400, 414 n. 25 (9th Cir.1983) (best explanation for the wording of Article 24(1) appears to be that the delegates did not intend the cause of action created by the Convention to be exclusive); *In re Aircrash in Bali, Indonesia On April 22, 1974,* 684 F.2d 1301, 1311 n. 8 (9th Cir.1982) ("the Convention has never been read to *limit* plaintiffs to a cause of action arising thereunder, but rather to limit the recovery in suits for injury") (emphasis in original), *later appeal,* 871 F.2d 812 (9th Cir. 1989); *Tokio Marine & Fire Insurance Co. v. McDonnell Douglas Corp.,* 617 F.2d 936, 942 (2d Cir.1980) (stating that Article 24 "indicates that [the drafters] did not intend the cause of action to be exclusive"); *In re Air Crash Disaster at Gander, Newfoundland,* 660 F.Supp. 1202, 1221 (W.D.Ky.1987) (Warsaw not intended to displace state law); *Rhymes v. Arrow Air, Inc.,* 636 F.Supp. 737, 740 (S.D.Fla.1986) (Article 24(1) "contemplates the application of the convention limitations to actions founded on a basis other than that of the convention"); *Perkin Elmer (Computer Systems Div.) v. Trans Mediterranean Airways, S.A.L.,* 107 F.R.D. 55, 61 (E.D.N.Y. 1985) ("state law cause of action may be available, even if a federal claim exists under the Convention").

The Supreme Court expressly has declined to address the question whether the Warsaw Convention provides the exclusive grounds for relief for an airline passenger involved in an accident. *Air France v. Saks,* 470 U.S. 392, 408, 105 S.Ct. 1338, 1347, 84 L.Ed.2d 289 (1985).

tation on liability, the Montreal Agreement's waiver of the airlines' due care defense, and the other provisions of the Warsaw system apply in this case. The only aspect of their claim under state law which the plaintiffs argue differs from the Convention but is nevertheless consistent with its scheme of recovery is their claim for punitive damages, to which we now turn.

## V. PUNITIVE DAMAGES

Plaintiffs in this case argue that Eastern's actions entitle them to punitive damages. Their argument that they are entitled to punitive damages is based both on the Warsaw Convention itself and on their state law cause of action for intentional infliction of emotional distress. We deal with these contentions in turn.

### A. *Punitive Damages Under the Warsaw Convention*

■ The plaintiffs argue that Article 25 of the Warsaw Convention creates an independent cause of action which authorizes the recovery of punitive damages. Plaintiffs argue that Article 25 not only removes the limitation on compensatory damages contained in Article 22 as modified by the Montreal Agreement, but that Article 25 also creates a cause of action itself which authorizes recovery of punitive damages. We reject this contention. The English translation [34] of Article 25 provides that:

(1) The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be the equivalent to wilful misconduct.

(2) Similarly the carrier shall not be entitled to avail himself of the said provisions, if the damage is caused under the same circumstances by any agent of the carrier acting within the scope of his employment.

The structure of the Convention, the subsequent interpretation by the parties, and the unanimous case law persuade us that Article 25 operates only to remove the liability limitations of Article 22 in cases of "willful misconduct" by the air carrier, and was not intended to provide an independent right of action.

The provisions of the Convention which create liability for injuries to passengers, damage to baggage and cargo, and delay, Articles 17, 18, and 19, are entirely compensatory in tone and structure. *In re Air Crash Disaster at Gander, Newfoundland,* 684 F.Supp. 927, 931 (W.D.Ky.1987). If a litigant is able to state a claim pursuant to one of these provisions, then Article 22, as modified by the Montreal Agreement, imposes a $75,000 limit on the carrier's liability which is created in Articles 17–19. In cases of willful misconduct, Article 25 strips the carrier of the liability limitation on compensatory damages. *See* Speiser and Krause § 11.36 at 761–62.

Subsequent conduct of the contracting parties supports this interpretation. This court has stated that "[m]inutes of the negotiations on the Hague Protocol, an amendment to the Convention, indicate that the delegates understood article 25 as referring only to article 22, which establishes monetary limits for recoveries under the Convention." *Highlands Insurance Co. v. Trinidad and Tobago (BWIA International) Airways Corp.,* 739 F.2d 536, 539 (11th Cir.1984); *citing* 1 International Conference on Private Air Law, *Minutes* at 166, ICAO doc. 7686–LC/140 (1955). In fact, the amended Article 25 specifically stated that "[t]he limits of liability specified in Article 22 shall not apply if it is proved that the damage resulted from an act or omission of the carrier, his servants or agents, done with intent to cause damage or recklessly and with knowledge that damage would probably result." Hague Protocol Art. XIII, *reprinted in* Kreindler, *Avia-*

---

**34.** Plaintiffs have not suggested an alternative French legal meaning of Article 25, nor has our research uncovered any, with the exception of the controversy surrounding the precise meaning of "willful misconduct," which we discuss briefly in Part VI, *infra.*

*tion Law Documents Supp.* at 959.[35]

Thus, the structure of the Convention and the subsequent actions of the contracting parties indicate that the phrase "provisions of this convention which exclude or limit his liability" used in Article 25 refers to the limitation on liability contained in Article 22, and does not create an independent cause of action contemplating punitive damages. *See H. Drion, Limitation of Liabilities in International Air Law* 70, 260–61 (1954) (Article 25 not intended to refer to any source of law outside of the Convention).

The cases which have addressed this issue uniformly have concluded that Article 25 does not create an independent right of action, but rather serves only to remove the limitation on liability contained in Article 22 of the Convention. *Highlands,* 739 F.2d at 539. *See Stone v. Mexicana Airlines, Inc.,* 610 F.2d 699, 700 (10th Cir. 1979) (allegations of willful misconduct do not avoid statute of limitations contained in Article 29(1)); *In re Air Crash Disaster at Gander, Newfoundland,* 684 F.Supp. 927, 932 (W.D.Ky.1987) (Article 25 an exception to limits on compensatory damages as authorized in Article 17, not an independent basis for awarding punitive damages); *Harpalani v. Air India, Inc.,* 634 F.Supp.

797, 799 (N.D.Ill.1986) ("Article 25 is most reasonably interpreted as an exception to the Convention's limitations on the recovery of compensatory damages, not as authority for a form of damages not permitted elsewhere in the Convention"), *disapproved on other grounds Wolgel v. Mexicana Airlines,* 821 F.2d 442, 445 (7th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 291, 98 L.Ed.2d 251 (1987); *Magnus Electronics, Inc. v. Royal Bank of Canada,* 611 F.Supp. 436, 443 (N.D.Ill.1985) ("*All* the cases teach the 'exclude or limit his liability' language was aimed at the familiar provisions of Article 22") (emphasis in original).[36]

*Highlands'* analysis of Article 25 was in the context of the applicability of the notice provisions of Article 26 in cases of willful misconduct. In *Highlands,* a shipper of goods failed to give proper notice to the airline pursuant to Article 26 of the Convention that his goods had been damaged during shipment. The shipper argued, *inter alia,* that the airline's willful misconduct served to remove the notice requirements. The court squarely rejected this argument, stating that "article 25 does not deprive the carrier of the article 26 notice provisions." 739 F.2d at 539. In light of the structure of the Convention, subse-

---

**35.** The amended Article 25 in Montreal Protocol No. 4 uses similar language, stating that "[i]n the carriage of passengers and baggage, *the limits of liability specified in Article 22 shall not apply* if it is proved that the damage resulted" from an intentional or reckless act on the part of the carrier or his employees. Montreal Protocol No. 4 Art. IX, *reprinted in* Kreindler, *Aviation Law Documents Supp.* at 997 (emphasis added). While the United States has not ratified the Hague or Montreal Protocols, we, like other courts, find their clarification of the operation of Article 25 to be instructive. *Highlands,* 739 F.2d at 539 n. 10. *See Saks,* 470 U.S. at 402–03, 105 S.Ct. at 1344 (Court relied on subsequent actions by contracting parties which have not been ratified by the Senate in interpreting Article 17 of the Convention).

**36.** The cases that the passengers cite for the proposition that Article 25 creates an independent basis for liability simply do not so hold. In *Butler v. Aeromexico,* 774 F.2d 429 (11th Cir.1985), the court upheld a damage award in excess of the $75,000 Warsaw Convention limitation based on Article 25. The court in *Butler*

framed the issue as "whether the conduct of defendant's crew amounted to 'wilful misconduct' within the meaning of Article 25 of the Warsaw Convention *so as to render inapplicable the convention's $75,000.00 limitation of liability provision (Article 22)*." 774 F.2d at 430 (emphasis added). Nowhere in *In re Aircrash in Bali, Indonesia on April 22, 1974,* 684 F.2d 1301 (9th Cir.1982), *later appeal,* 871 F.2d 812 (9th Cir. 1989), does the court suggest that Article 25 offers an independent source of a right of action. In fact, when discussing the Convention in general terms, the court states that Article 25 "excepts from the limit on the carrier's liability, injury or death caused by the carrier's 'willful misconduct.'" 684 F.2d at 1305. Finally, in affirming the court below, the court in *Compania de Aviacion Faucett S.A. v. Mulford,* 386 So.2d 300, 301 (Fla. 3d D.C.A.1980), expressly stated that "the lower court found that the airline had been guilty of 'wilful misconduct' under Article 25(1) so as to render inapplicable the provisions of Article 22(2) of the Warsaw Convention." It is difficult to construe this language as suggesting that Article 25 operates as a separate ground for recovery.

quent interpretations of the parties, and unanimous case law, we readily extend the principle articulated in *Highlands* and hold that Article 25 of the Warsaw Convention does not create an independent cause of action for willful misconduct which would entitle plaintiffs to punitive damages.[37]

### B. *Punitive Damages Under State Law*

■ Plaintiffs argue that recovery of punitive damages under state law is not inconsistent with the Warsaw Convention. They contend that the Convention's silence on the question of punitive damages means that recovery of punitive damages under Florida law is allowed.[38] The unofficial English translation[39] of Article 24 of the Convention provides that

> (1) In the cases covered by articles 18 and 19 any action for damages, however founded, can only be brought subject to the conditions and limits set out in this convention.

> (2) In the cases covered by article 17 the provisions of the preceding paragraph shall also apply, without prejudice to the questions as to who are the persons who have the right to bring suit and what are their respective rights.

Article 24 thus requires this court to determine whether an award of punitive damages is contemplated by the "conditions and limits set out in this convention." In other words, the issue is whether an award of punitive damages would be in conflict with the scheme of liability provided for in the Warsaw Convention. We conclude that there would be a conflict, and therefore hold that plaintiffs' claim for punitive damages under Florida law is preempted by the Warsaw Convention.

■ Before we address the question of whether an award of punitive damages under state law would conflict with the Convention, we must first determine whether the Convention itself contemplates recovery for punitive damages.[40] We have al-

---

**37.** Plaintiffs do not argue that the cause of action for personal injuries created by Article 17 authorizes recovery of punitive damages. We agree that Article 17 contemplates only compensatory damages, which we see below has considerable significance in our rejection of plaintiffs' argument that the Convention's "silence" on the issue of punitive damages allows them to recover punitive damages under state law.

**38.** Because the district court held that plaintiffs could not state a cause of action under the Warsaw Convention, 629 F.Supp. at 312–14, it did not address the question of whether awarding punitive damages under state law would conflict with the Convention.

**39.** While the French legal meaning of the Warsaw Convention controls its interpretation, see Part III, *supra*, we need not set out the original French text of Article 24 here because the precise legal meaning of the terms has not been questioned. *See Denby v. Seaboard World Airlines, Inc.,* 737 F.2d 172, 177 (2d Cir.1984) (Friendly, J.) ("As a practical matter, however, American lawyers and courts have initially addressed themselves to the English text and have consulted the French text only when there is a substantial contention that it has a different meaning.").

**40.** Apart from the liability limitations contained in Article 22 of the Convention, the issue of the computation of damages generally is governed by local law, except, of course, where such law conflicts with the Convention. *Harris v. Polskie Linie Lotnicze,* 820 F.2d 1000, 1002 (9th Cir.

1987); *In re Aircrash in Bali, Indonesia on April 22, 1974,* 684 F.2d 1301, 1315 (9th Cir.1982), *later appeal,* 871 F.2d 812 (9th Cir.1989); *Mertens v. Flying Tiger Line, Inc.,* 341 F.2d 851, 858 (2d Cir.), *cert. denied,* 382 U.S. 816, 86 S.Ct. 38, 15 L.Ed.2d 64 (1965); *Cohen v. Varig Airlines,* 62 A.D.2d 324, 405 N.Y.S.2d 44, 49 (1978). *See* Kreindler, 1 *Aviation Accident Law* § 11.08 at 11–94. As the discussion in the text indicates, the issue in this case—whether the state law claim for punitive damages is inconsistent with the Convention—is not merely a matter of computation of damages; rather we hold that the state law claim for punitive damages is inconsistent with the compensation scheme established by the Convention.

Courts sometimes have had difficulty determining exactly when a local law damage provision conflicts with the Convention. *See, e.g, O'Rourke v. Eastern Air Lines, Inc.,* 553 F.Supp. 226, 228 (E.D.N.Y.1982) (determination whether prejudgment interest available in action arising out of plane crash "must be determined solely with respect to the Warsaw Convention/Montreal Agreement. All local law to the contrary ... must therefore be preempted"), *aff'd in relevant part* 730 F.2d 842, 851–53 (2d Cir.1984) (court refused to allow prejudgment interest in a case governed by the Convention); *Deere & Co. v. Deutsche Lufthansa Aktiengesellschaft,* 855 F.2d 385, 391–92 (7th Cir.1988) (same). *But see Domangue v. Eastern Air Lines, Inc.,* 722 F.2d 256 (5th Cir.1984) (prejudgment interest, subject to damage limits, allowed in a Warsaw case because it furthers the purpose of speeding

ready rejected plaintiffs' argument that Article 25 creates a separate cause of action for "willful misconduct" that contemplates the recovery of punitive damages. For the reasons indicated below we also conclude that Article 17 does not authorize recovery of punitive damages. In fact, plaintiffs do not argue that it does; rather, they contend that they have both a state law cause of action for intentional infliction of emotional distress (which permits recovery of punitive damages in appropriate cases) and a Warsaw Convention cause of action (which is silent on punitive damages). Because the Convention is silent on the issue, they contend that an award of punitive damages would be consistent with the provisions of the Convention.

It is true that the text of the Convention does not explicitly address the issue of punitive damages. However, we do not think plaintiffs can take much comfort in this "silence." The basis for recovery for passengers who suffer death or personal injury in international air travel is Article 17 of the Convention. Our study of the text and structure of the Convention, and the concurrent and subsequent legislative history persuade us that Article 17 is entirely compensatory in nature.

As we have previously noted, Article 17 of the Convention provides that "Le transporteur est responsable du *dommage survenu* en cas de mort, de blessure ou de toute autre lésion corporelle . . ." (emphasis added). We have already concluded that *lésion corporelle* encompasses the concept of mental or emotional injury. Part III, *supra*. Plaintiffs' contention that the Convention authorizes the recovery of punitive damages requires us to analyze the meaning of *dommage survenu* ("damage sustained") in order to determine whether that phrase allows punitive damages.

▄▄▄▄ Plaintiffs have pointed to no authority suggesting that the French legal meaning of Article 17 permits recovery of punitive damages, and we have found no such authority. *See Saks,* 470 U.S. at 399,

105 S.Ct. at 1342 (French legal meaning controls terms of Convention). In fact, what we have found indicates otherwise. In civil law systems, an action under the Warsaw Convention sounds in contract. *Block v. Compagnie Nationale Air France,* 386 F.2d 323, 331 (5th Cir.1967), *cert. denied,* 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968); Nicolas Mateesco Matte, *Treatise on Air–Aeronautical Law* 403–04 (1981). The parties may agree to a penalty clause, but punitive damages generally are not available in contract actions. *See* Marcel Plainol and George Ripert, 2 *Treatise on the Civil Law* No. 247 at 149 (11th ed. 1959) (Louisiana State Law Institute translation) ("[t]he indemnity should represent exactly as possible the real damage suffered by the creditor"); Barry Nicholas, *French Law of Contract* 226 (1982) ("The overriding principle [in assessing damages] is that damages should compensate the creditor for the loss suffered. The expression of disapproval of the debtor's conduct has no place in the assessment of damages").

▄▄▄▄ The plaintiffs in *In re Air Crash Disaster at Gander, Newfoundland,* 684 F.Supp. 927 (W.D.Ky.1987), argued that the word *"survenu"* in Article 17 was more appropriately translated as "happened" or "arisen," not as "sustained." The court declined to accept this interpretation, noting that the plaintiffs cited no authority for their assertion. 684 F.Supp. at 931. The term *dommage survenu* or "damage sustained" is entirely compensatory in tone. *Gander,* 684 F.Supp. at 931. Punitive damages are intended to penalize the wrongdoer in order to benefit society, and as such are not "sustained" by the victim. *See* Morris, Punitive Damages in Tort Cases, 44 Harv.L. Rev. 1173, 1183 (1931).

We also find significance in the fact that the only provision of the Convention which addresses remedies for intentional or reckless acts by the carrier, acts usually associated with the recovery of punitive damages

settlement and recovery); *Eli Lilly Argentina, S.A. v. Aerolineas Argentinas,* 133 Misc.2d 858,

508 N.Y.S.2d 865 (N.Y.Civ.1986) (same).

in the United States,[41] did not address the issue of punitive damages at all. Rather, as we have already demonstrated, Article 25 provided only that the strict limit on liability for compensatory damages was to be lifted in cases of intentional or willful acts.

Nowhere in the Minutes of the Convention is there any mention of deterring misconduct by imposing punitive damages on derelict air carriers. *See generally Minutes.* Thus, the concurrent legislative history supports the interpretation that the Convention contemplates recovery of only compensatory damages.

Unlike *lésion corporelle*, subsequent interpretations of the parties have cast no doubt as to the accuracy of the translation of *dommage survenu* as "damage sustained." The official English translation adopted at The Hague in 1955, the United States State Department translation which accompanied the Convention when it was ratified by the Senate, and the Guatemala Protocol all use the "damage sustained" language. *See* 49 U.S.C. note following § 1502 (American translation), Kreindler, *Aviation Law Documents Supp.* at 955, 975 (official English translation, Guatemala Protocol).

We are thus convinced that the plaintiffs' claim for punitive damages finds no support in the Convention, either in those provisions creating liability (Articles 17–19) or in the provision which allows full compensation in cases of willful misconduct by the air carrier (Article 25). Plaintiffs contend, however, that their state law claim for punitive damages does not conflict with the Convention's "silence" on punitive damages. We disagree, and conclude that recovery of punitive damages under state law would conflict with the scheme of recovery established by the Convention.

■ We note at the outset the significant difference between punitive damages and compensatory damages. Punitive damages are not intended to compensate victims, but rather are private fines, awarded in addition to what is necessary to compensate victims, levied by civil juries to punish a defendant for his conduct and to deter others from engaging in similar conduct in the future. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 2759, 69 L.Ed.2d 616 (1981); *International Brotherhood of Electrical Workers v. Foust,* 442 U.S. 42, 48, 99 S.Ct. 2121, 2125–26, 60 L.Ed.2d 698 (1979); Prosser § 2 at 9–15.[42] As our discussion has indicated, the Warsaw Convention contemplated recovery of only compensatory damages. We believe that the intent of the Convention to provide compensatory damages suggests that it would be inconsistent to allow punitive damages which serve a purpose very different from compensating victims.

■ This conclusion is supported by the purposes and goals of the Convention to limit strictly the liability of the airlines and to provide a uniform and comprehensive scheme of liability. The Convention was intended to place strict limits on air carrier liability for accidents, as well as to ensure at least a measure of compensation for accident victims. *See* Lowenfeld and Mendelsohn, 80 Harv.L.Rev. at 498–501; Part III, *supra.* Holding that punitive damages are unavailable in an action governed by the Warsaw Convention furthers the goal of certainty of liability. *See Reed v. Wiser,* 555 F.2d 1079, 1089 (2d Cir.) ("It is beyond dispute that the purpose of the liability limitation prescribed by Article 22 was to fix at a definite level *the cost to airlines* of damages sustained by their passengers and

---

**41.** *See Dorsey v. Honda Motor Co.,* 655 F.2d 650, 657–58 (5th Cir. Unit B 1981), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982), *later proceeding* 730 F.2d 675 (11th Cir.1984); Prosser § 2 at 9–10.

**42.** While mental injuries (*dommage moral* in the civil law) are intangible in nature, allowing recovery for them is intended to be compensatory, and is in no way meant to penalize the

wrongdoer. *See McGee v. Yazoo & M.V.R. Co.,* 206 La. 121, 19 So.2d 21 (1944) ("damages for mental anguish or suffering are actual rather than exemplary or punitary"); Barry Nicholas, *French Law of Contract* 220–23 (1982); Marcel Plainol and George Ripert, 2 *Treatise on the Civil Law* Nos. 867–868A at 470–73 (11th ed. 1959) (Louisiana State Law Institute translation).

of insurance to cover such damages."), (emphasis in original), *cert. denied,* 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977). Allowing punitive damages in Warsaw Convention cases would undermine this strict limitation of liability, which was the central feature of the Warsaw system. *See Trans World Airways, Inc. v. Franklin Mint Corp.,* 466 U.S. 243, 256, 104 S.Ct. 1776, 1784, 80 L.Ed.2d 273 (1984).

The recovery of punitive damages would also be inconsistent with the goal of the Convention to provide a comprehensive and uniform scheme governing the liability of the airlines in the areas covered by the Convention. The text of the Convention points out the necessity of uniformity and the desire for a comprehensive set of rules in those areas where the signatories intended the Convention to apply. The preamble of the Convention declares the intent of the signatory nations as "regulating in a uniform manner the conditions of international transportation by air in respect of the documents used for such transportation and of the liability of the carrier." Article 1(1) of the Convention provides that "[t]his convention *shall* apply to *all* international transportation of persons, baggage, or goods performed by aircraft for hire" (emphasis added). Uniformity of rules governing international air operations is a primary goal of the Convention. *See Reed v. Wiser,* 555 F.2d 1079, 1090 (2d Cir.) ("fundamental purpose of the signatories to the Warsaw Convention, which is entitled to great weight in interpreting that pact, was their desire to establish a uniform body of worldwide liability rules to govern international aviation, which would supersede with respect to international flights the scores of differing domestic laws") (footnote omitted), *cert. denied,* 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977); *Block v. Compagnie Nationale Air France,* 386 F.2d 323, 337–38 (5th Cir.1967) ("The Court has an obligation to keep interpretation as uniform as possible."), *cert. denied,* 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968). This uniformity interest applies not only internationally, but also within the United States as well. *Boehringer–Mannheim Diagnostics, Inc. v. Pan American World Airways, Inc.,* 737 F.2d 456, 459 (5th Cir. 1984), *cert. denied,* 469 U.S. 1186, 105 S.Ct. 951, 83 L.Ed.2d 959 (1985). It would contravene the Convention's goal of uniformity should there be recovery for punitive damages in some forums and not in others.

We have found no case in which a court awarded punitive damages in a case governed by the Convention, and we decline to depart from this uniformity. In *Butler v. Aeromexico,* 774 F.2d 429 (11th Cir.1985), this court held that the Convention preempted Alabama law regarding damages for wrongful death. In that case, the court stated that Alabama law, which allows recovery for only punitive damages in a wrongful death case, "conflict[ed] with the tenor of the Warsaw Convention, *which contemplates compensation for victims of air disasters."* 774 F.2d at 431 (emphasis added). While the court in *Butler* did not squarely hold that only compensatory damages are available under the Warsaw system, the decision clearly points to that result, which we make explicit today.

The only decisions which have explicitly confronted the issue also support our conclusion. After undertaking an analysis similar to the one above, the court held in *In re Aircrash Disaster at Gander, Newfoundland,* 684 F.Supp. 927 (W.D.Ky. 1987), that "the Warsaw Convention by its terms and history allows *compensatory* damages claims against carriers arising under state law but excludes *punitive* damages claims" in wrongful death actions under Article 17. 684 F.Supp. at 933 (emphasis in original). The court in *Gander* also held that the Convention preempted plaintiffs' state law claims for punitive damages. *Id.; see Harpalani v. Air–India, Inc.,* 634 F.Supp. 797 (N.D.Ill.1986) (court struck plaintiffs' claim for punitive damages under Article 19 of the Convention), *disapproved on other grounds Wolgel v. Mexicana Airlines,* 821 F.2d 442, 445 (7th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 291, 98 L.Ed.2d 251 (1987).[43]

---

**43.** Plaintiffs cite *Hill v. United Airlines,* 550 F.Supp. 1048 (D.Kan.1982), to support their con-

We conclude that the Warsaw Convention itself provides for recovery of compensatory damages only, and that it would be inconsistent with the Convention's scheme of recovery to allow plaintiffs to recover punitive damages on their state law cause of action. Therefore, we hold that the Convention preempts plaintiffs' claim under Florida law for punitive damages.

## VI. WILLFUL MISCONDUCT ON REMAND

While it is clear that Article 25 does not provide an independent basis for holding Eastern liable for punitive damages, it is possible that the facts alleged here constitute willful misconduct and serve to remove the liability limitations on compensatory damages of Article 22 and the Montreal Agreement.[44]

■■■■ This question must first be addressed by the trial court on remand. Willful misconduct is a question of fact and should be addressed in the first instance by the district court. *Butler v. Aeromexico,* 774 F.2d 429, 432 (11th Cir.1985); *Abramson v. Japan Airlines Co., Ltd.,* 739 F.2d 130, 135 (3d Cir.1984), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1776, 84 L.Ed.2d 835 (1985). Determining whether willful misconduct occurred in a given case is an extremely fact-sensitive inquiry. The plaintiff has the burden of proving willful misconduct by the air carrier. *Berguido v. Eastern Air Lines, Inc.,* 317 F.2d 628, 629 (3d Cir.), *cert. denied,* 375 U.S. 895, 84 S.Ct. 170, 11 L.Ed.2d 124 (1963); *Grey v. American Airlines, Inc.,* 227 F.2d 282, 285 (2d Cir.1955), *cert. denied,* 350 U.S. 989, 76 S.Ct. 476, 100 L.Ed. 855 (1956); *Domangue v. Eastern Air Lines, Inc.,* 531 F.Supp. 334, 341 n. 51 (E.D.La.1981); Speiser and Krause § 11.37 at 772.

## VII. AMENDMENT OF COMPLAINTS

Plaintiffs in two of the twenty-five cases before us on appeal, Sandy Dix and Gary Dix (case number 84–0030) and Salim

---

tention that the Convention contemplates recovery of punitive damages. In *Hill,* the plaintiffs claimed damages for intentional misrepresentation arising out of international air transportation. The court initially found that "[l]iability, if any, is predicated on defendant's commission of the tort of misrepresentation, a circumstance completely outside of the Warsaw Convention." 550 F.Supp. at 1054. The court went on, however, to state that "while the Warsaw Convention is basically the controlling law in this case, plaintiffs have properly invoked the provisions of Article 25(1), which make an exception to defendant's limited liability and might entitle plaintiffs to recover actual and punitive damages...." 550 F.Supp. at 1056. It is not clear whether the court in *Hill* held that punitive damages are recoverable in an action governed by the Convention, since the court appeared to hold that the Convention was inapplicable to the facts of that case. In any event, to the extent that *Hill* authorizes recovery of punitive damages under the Warsaw Convention, we decline to accept its holding. *See In re Air Crash Disaster at Gander, Newfoundland,* 684 F.Supp. 927, 933 (W.D.Ky.1987).

**44.** The precise formulation of Article 25 has been a subject of international scholarly and judicial dispute. The French version of Article 25(1) reads as follows:

(1) Le transporteur n'aura pas le droit de se prevaloir des dispositions de la presente Convention qui excluent ou limitent sa responsabilite, si le dommage provient de son dol ou d'une faute qui, d'apres la loi du tribunal saisi, est considere comme equivalente au dol.

The term *"dol"* has no precise common law analogue. It does seem evident, however, that the term "willful misconduct" expressed the intent of the drafters of the Convention at the time, any doubts about the precise terminology notwithstanding. *See Minutes* at 59 (Sir Alfred Dennis, leader of the British delegation, stated that "[w]e have at home the expression 'willful misconduct'; I believe that it covers all that which you mean; it covers not only deliberate acts but also careless acts done without regard for the consequences."); Miller at 80 ("[i]n an English court, air carriers would be subjected to unlimited liability in cases of wilful misconduct, and, in civil law courts, there would be unlimited liability in cases of *dol* "). American courts have relied upon the term "willful misconduct" as the correct manifestation of the drafters' intent. *See, e.g., Butler v. Aeromexico,* 774 F.2d 429, 430 (11th Cir.1985); *Koninklijke Luchtvaart Maatschappij N.V. KLM Royal Dutch Airlines Holland v. Tuller,* 292 F.2d 775 (D.C.Cir.), *cert. denied,* 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961); *Pekelis v. Transcontinental & Western Air, Inc.,* 187 F.2d 122, 125 n. 2 (2d Cir.), *cert. denied,* 341 U.S. 951, 71 S.Ct. 1020, 95 L.Ed. 1374 (1951); *American Airlines, Inc. v. Ulen,* 186 F.2d 529, 533 (D.C.Cir.1949) (Minutes of the Convention "show little more than that the delegates were at the time in disagreement as to what terms would express their intent when translated into various languages").

Khoury and Deborah Khoury (case number 84–1703), sought leave to amend their complaints to allege physical injury resulting from the events on Flight 855. The district court denied their motions to amend. We hold that the trial court abused its discretion in refusing to allow these plaintiffs to amend their complaints to allege physical injury.

In denying these plaintiffs' motions to amend, the district court stated that "the question of whether any of the Plaintiffs have sustained physical injuries has been an issue in this case for over a year." Order Denying Motion for Reconsideration 4 (April 28, 1986) (R 3–125:4). Although they did not seek to formally amend their complaints until after the district court's dismissal of their initial complaints, the Dix and Khoury plaintiffs had offered to amend their complaints as early as June, 1985, in a memorandum filed in opposition to Eastern's motion to dismiss. The mere passage of time, without anything more, is an insufficient reason to deny leave to amend. *Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594, 597–98 (5th Cir.1981). *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Here, the plaintiff's offer to amend was made in response to the defendant's initial challenge to the sufficiency of the complaint. Any delays thereafter were due to scheduling delays, not to any dilatory actions by the plaintiffs who sought leave to amend. Eastern did not allege any prejudice due to this alleged delay; in fact, it apparently consented to amending the complaints to show physical injury.[45] Because we have held that physical injury is not necessary to state a claim under the Warsaw Convention, a lack of physical injuries is not fatal to these plaintiffs' complaints. Nevertheless, a showing of physical injury may affect the plaintiffs' recoverable damages, and we therefore reverse the district court's denial of their motion to amend.

For these reasons, we hold that the trial court abused its discretion in refusing to allow the Dix and Khoury plaintiffs leave to amend their complaints to allege physical injury.

## VIII. CONCLUSION

In conclusion, we currently are bound by the Florida decision that the plaintiff passengers on Eastern Flight 855 have stated a cause of action for intentional infliction of emotional distress under Florida law. Final resolution of that issue must await the Supreme Court of Florida's decision on the issue. We hold that the plaintiffs' allegations of emotional injury are sufficient to state a cause of action under the Warsaw Convention. We also hold that this Warsaw Convention cause of action preempts those aspects of the state law cause of action which conflict with the Convention, including plaintiffs' claim for punitive damages. In addition, plaintiffs' allegations of willful misconduct under Article 25 of the Warsaw Convention serve not as an independent basis for relief, but only to remove the liability limitations of the Convention if willful misconduct can be demonstrated. Whether Eastern's actions in this case constituted willful misconduct is for the district court to determine on remand. Finally, we reverse the district court's denial of leave to amend the Dix and Khoury complaints.

**REVERSED and REMANDED.**

---

**45.** At a January 21, 1986 hearing on the motions to dismiss, counsel for Eastern stated that "[t]here are some cases which I think haven't been pled, and there are cases which certainly you could give them the opportunity to amend a subsequent physical sequellae." SR 1:26. The trial court construed this concession to amendment "to extend only to those complaints wherein there appeared an allegation of some type of physical injury." R 3–125:4.